UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

THE CINCINNATI SPECIALTY
UNDERWRITERS INSURANCE
COMPANY,

     Plaintiff,

v.                                  Case No. 3:22cv23795-TKW-HTC

MIELE, INC., et al.,

     Defendants,

v.

ROBERTSHAW ITALY S.R.L., et al.,

     Third-Party Defendants.

_____/

<u>REPORT AND RECOMMENDATION</u>

     This products liability case is before the Court on Robertshaw Italy S.r.l.

("Robertshaw Italy") and Robertshaw SRO's (collectively, the "Robertshaw

Defendants") motion to dismiss Miele, Inc.'s ("Miele US") Third-Party Complaint

for lack of personal jurisdiction.[1]  Doc. 61.  Upon consideration of the relevant law,

the parties' written submissions, Docs. 126, 127, and 135, and the evidence and

---

[1] Although the Robertshaw Defendants also initially contested proper service, that issue has been mooted and was not addressed in the parties' supporting memoranda or at the evidentiary hearing. Doc. 126 at 2.

argument presented at the March 27, 2024 evidentiary hearing, the undersigned finds the motion should be GRANTED.

## I.    BACKGROUND

This action involves a subrogation claim for damage to a residence caused by a leak in a plumbed coffee system.  In 2016, the McKays contracted with EGCD Construction, LLC ("EGCD"), to construct a new residence in Alys Beach, Florida. EGCD hired Builder Specialties, Inc. ("Builder"), also a defendant in this action, to build the residence.  Sometime in 2018, Miele US sold the plumbed coffee system, a Miele Coffee System Model #CVA6805, to Builder, which installed the system inside a cabinet in the McKays' home in December 2018.  In February 2019, a painter discovered the residence was flooded and determined water was leaking from the coffee system.  The flooding caused extensive damage to the residence. *See* Doc. 8 (First Amended Complaint).

According to Miele US's Third-Party Complaint, Doc. 17,[2] the damage was caused by a defect in the coffee system which prevented the solenoid valve from closing.  The subject solenoid valve was distributed by the Robertshaw Defendants. Specifically, the subject valve was manufactured by a Robertshaw SRO subcontractor in May 2018, labeled by Robertshaw Italy, and distributed by

---

[2] There are two identical third-party complaints on the docket, one identified as Doc. 17 and the other as Doc. 19.

Robertshaw SRO from its Sternbeck facility in the Czech Republic. Doc. 126 at 3-4; Doc. 127-17 at 12-13. Robertshaw SRO sold the subject valve to Anton Helbling AG, a Swiss company, which then sold the valve to Eugster/Frisman AG, another Swiss company, which incorporated the valve into a coffee system that was sold to Miele & Cie. KG, a German corporation ("Miele Germany"), for distribution to the United States through Miele US. Doc. 127-2 at 2.[3]

Miele contends that if it is found liable to the Plaintiff for the damage to the McKays' home, then the Robertshaw Defendants should be liable to Miele.

## II. JURISDICTIONAL FACTS

The following facts are undisputed[4]:

- Robertshaw Italy is an Italian company and Robertshaw SRO is a Czech Republic company.[5] Doc. 17 at 2; Doc. 83-1 at 1; Doc. 83-2 at 1. Robertshaw Italy

---

[3] Miele filed a notice of filing exhibits supporting its opposition to the motion to dismiss, *see* Doc. 127. Several of those same exhibits were admitted into evidence at the evidentiary hearing. For purposes of this Report and Recommendation, the undersigned refers to the Doc. 127 exhibit numbers when possible.

[4] These facts are derived from: (1) the deposition testimony of Christopher Davis, a director for Robertshaw SRO and the general counsel and vice president of human resources for Robertshaw Italy; (2) documentary evidence submitted by Miele in support of its opposition to the motion to dismiss, Doc. 127-10 to 127-16 (10/27/23), Doc. 127-17 to 127-20 (10/30/23), Doc. 127-21 (11/8/23); and (3) evidence presented by Miele at the evidentiary hearing, including testimony from Miele's Technical Director, Oliver Schmidt ("Schmidt"), and its expert, Michael Gordon ("Gordon").

[5] Robertshaw SRO ceased doing business on March 31, 2019, but remains a legal entity. Doc. 127-11 at 37; 127-17 at 12; 127-17 at 15. Its operations were transferred to Robertshaw CZ Limited. Doc. 127-10 at 61. Davis is also a director of Robertshaw CZ Limited, a UK entity. Doc. 127-10 at 42.

was the engineering or operational arm for Robertshaw SRO and Robertshaw SRO operated a manufacturing facility in Sternbeck, Czech Republic.  Doc. 127-11 at 43.

- The Robertshaw Defendants are engaged in the business of manufacturing, distributing, selling, supplying, and placing into the stream of commerce, water solenoid valves and other products and component products in the international market, including the U.S.  Doc. 127-11 at 38.

- The subject solenoid valve had certain markings indicating that it was compliant with U.S. regulatory standards, including an NSF/ANSI certification, a UL rating, and an ASD FC certification.  *See* Gordon Evid. Hrg. Testimony; Doc. 127-9 (Gordon Aff.).  The NSF/ANSI and ASD certifications are registered to Robertshaw Italy.  *Id.*; Doc. 127-32 at 43.  The UL certification indicates the product's ultimate use is unknown.  *See* Gordon Evid. Hrg. Testimony.

- The Robertshaw Defendants and other Robertshaw entities, including a U.S.-based company called Robertshaw Controls Company ("RCC") operate as a group of companies doing business under the "style of Robertshaw" or the Robertshaw brand (hereinafter referred to as "The Robertshaw Group").  Doc. 127-10 at 26, 44, 52; 127-13 at 52; Doc. 127-17 at 15.  The Robertshaw Group shares eight functions, including engineering, human resources, and legal.  Doc. 127-10 at 17-18.

- The Robertshaw Defendants and RCC are owned by the same U.S. parent, Range Parent, Inc. ("Range"), and have overlapping directors, employees, and agreements, including Christopher Davis and Aaron Rachelson.  Doc. 127-11 at 36; Doc. 127-17 at 27; Doc. 127-19 at 5-6; Doc. 127-10 at 59-61.

- The Robertshaw Defendants, Range, and RCC share the same CEO, J. Hewitt.  Doc. 126 at 21; Doc. 127-11 at 2.

- RCC and Range have their principal place of business in Itasca, Illinois. Itasca, Illinois is also described as the "Robertshaw Global Headquarters."  Doc. 127-26 at 5.

- The Robertshaw Group, including the Robertshaw Defendants and RCC, have recharge agreements which govern their shared resources and responsibilities.  Doc. 127-29 at 4-35.

- Robertshaw SRO sold solenoid valves to original equipment manufacturers ("OEMs").  Doc. 127-11 at 40.

- Robertshaw SRO distributed solenoid valves to four (4) U.S.-based companies between 2016 and 2019; the sales of valves into the United States made up approximately 0.5% of Robertshaw SRO's total sales revenue.[6]  Doc. 127, p.

---

[6] In the Robertshaw Defendants' motion to dismiss, they also argue they do not conduct any business in the United States and have sold no products directly to United States customers.  That position, however, proved to be false and the Court publicly admonished the Robertshaw Defendants for submitting false affidavits.  Doc. 141.  The Defendants also state that they do not

1734 (labeled as Exhibit 13); Exh. 16.[7]  Those valves were not shipped into Florida. Doc. 127-18 at 18; Doc. 127-13 at 39-41.  Those U.S.-based companies conducted business in Florida.  Doc. 127-31 at 45-51.

- In selling products to customers in the U.S., the Robertshaw Defendants do not seek to serve the Florida market.  Doc. 127-21 (sealed copy, p. 891).[8]

- The Robertshaw Defendants do not have a record of having made any sales to OEMs or other customers in Florida.  Doc. 127-12 at 22; 29-30, Doc. 127-13 at 38; Doc. 127-17 at 58; Doc. 127-18 at 18, 23; Doc. 127-21 (sealed copy, p. 888).  The Robertshaw Defendants did not track how the valves were ultimately used or where the valves may have been distributed after the initial sale to the OEMs. Doc. 127-13 at 41; Doc. 127-17 at 48, 51-52.

- The Robertshaw Group advertises the Robertshaw brand to the United States via a US-hosted website operated by RCC "and its affiliates,"

---

own or operate an office in Florida, have not owned any property or maintained a bank account in Florida, or placed in the stream of commerce any products which they knew or should know would be in Florida.  Doc. 61 at 13.  Although Defendants cite Davis's affidavits to support those statements, nowhere in the affidavits does Davis provide such testimony.  *See* Docs. 83-1 and 83-2.

[7] Miele identifies the "confidential" exhibits to Davis's deposition as Exhibit 14 to Doc. 127. Nonetheless, the hardcopy exhibits submitted to the Court were labeled as Exhibits 12-17 and 30. Regardless, because Miele separately divided Davis's deposition transcript into individual exhibits, those being Exhibits 10-21, the numbering on Doc. 127 is incorrect.  The documents referenced in Davis's deposition should have been exhibits 22-36 of Doc. 127.  Thus, for ease of reference, "p." stands for the pagination located on the bottom left corner.

[8] Davis's 11/8/23 deposition transcript is identified as being located at Exhibit 12 of Doc. 127. However, Doc. 127 contains only a placeholder for the transcript at Exhibit 21.  A hardcopy of the *unredacted* transcript is maintained by the clerk's office.  The "p." refers to the pagination located in the lower left-hand corner of the transcript.

www.robertshaw.com, hereinafter referred to as the "Robertshaw Website." Doc. 127-26 at 7.

- The Robertshaw Website defines "Robertshaw," as a "global design, engineering and manufacturing company," headquartered in Illinois. Doc. 127-26 at 5. The Robertshaw Defendants are listed on the website as being part of Robertshaw's global business. *Id.*

- The Robertshaw Website is an interactive multilingual website that can be accessed by anyone in the United States, including in Florida.

- The Robertshaw Website identifies "Robertshaw" as having seven (7) locations in the U.S. and four (4) locations in Europe, including Italy and the Czech Republic. Doc. 127-26 at 10-14.

- The Robertshaw Defendants' Terms and Conditions of Purchase and Sale are posted on the website. Doc. 127-25 at 25-39; Doc. 127-27 at 22-34.

- A catalog containing products belonging to Robertshaw Italy can be found on the Robertshaw website.

- The Robertshaw Website identifies at least six (6) regional "Robertshaw" distributors located in Florida. Doc. 127-26 at 15.

- Other than, arguably, through the Robertshaw Website, the Robertshaw Defendants do not market or promote the sale of valves in Florida. Doc. 127-18 at 5.

- The Robertshaw Defendants do not have a record of making any sales to Florida arising from the Robertshaw Website.  Doc. 127-12 at 14; Doc. 127-17 at 36; Doc. 127-12 at 21, 24; Doc. 127-21 (sealed copy, p. 885).

- The Robertshaw Defendants do not have any sales or customer service personnel located in Florida.  Doc. 127-21 (sealed copy, p. 888).

- The subject valve could not be purchased through the Robertshaw Website because it is a commercial grade product not intended for direct consumer use.  *See* Gordon Evid. Hrg. Testimony.

- Although other products are advertised through the Robertshaw Website, they must be purchased through a separate distributor link that can be accessed on the website.  Payments are made directly to the authorized distributor. *Id.*

- There is no evidence that any product manufactured or distributed by the Robertshaw Defendants can be purchased directly through the website, or indirectly, through any distributor.  *Id.*

- Gordon was unable to locate any valves containing the same ASD certification number as the subject valve on the website.  Gordon, thus, contacted a "Robertshaw" customer service employee and spoke with a M. Chance over the phone.  Chance informed Gordon the subject valve could not be purchased by a consumer.  Gordon then purchased a different valve, one for consumer use in a

refrigerator and manufactured in Mexico, from the website, via a link through a Florida-based distributor, Grainger.  *Id.*

- The Robertshaw Website contained a customer service number for Robertshaw Italy and Robertshaw SRO, in Italy and the Czech Republic, respectively.  Doc. 127-26 at 23.

- Over the past 18 months, Miele has sold 12,500 plumbed coffee systems in the United States.  Of those, 1,500 were sold in Florida, which Miele believes contained solenoid valves manufactured by Robertshaw SRO (or its successor Robertshaw CZ Limited).  *See* Schmidt Evid. Hrg. Testimony.

## III.  LEGAL STANDARD

To determine whether this Court has personal jurisdiction over the Robertshaw Defendants, the Court must engage in a two-part analysis.  *See Madara v. Hall*, 916 F. 2d 1510, 1514 (11th Cir. 1990).  First, jurisdiction must be examined under the forum state's long-arm statute.[9]  *Id*.  Second, if there is a basis for the assertion of personal jurisdiction under the state statute, the court next determines whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that "maintenance of the suit does not offend 'traditional

---

[9] There is no dispute Miele has alleged facts sufficient to establish jurisdiction under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(6).  The valve at issue was manufactured or distributed by the Robertshaw Defendants and it allegedly caused injury to a real property in Florida.  Because this issue is not disputed, it will not be separately addressed herein.

notions of fair play and substantial justice.'"  *Id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

The minimum contacts analysis varies depending on whether the type of jurisdiction asserted is general or specific.  Facts supporting "[p]ersonal jurisdiction may be general, which arise from the party's contacts with the forum state that are unrelated to the claim, or specific, which arise from the party's contacts with the forum state that are related to the claim."  *Nippon Credit Bank, Ltd. v. Matthews,* 291 F.3d 738, 747 (11th Cir. 2002).  Miele is proceeding under a theory of specific jurisdiction. Doc. 126 at 2, fn. 1.  In specific personal jurisdiction cases, the Eleventh Circuit applies a three-part due process test, which examines: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–73, 474–75 (1985)).  The

Court need not address the third prong if Miele is unable to establish the first two prongs.[10] *Id.*

To overcome a motion to dismiss based on lack of personal jurisdiction, the plaintiff must allege facts sufficient to make a prima facie case for jurisdiction. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see also*, Fed. R. Civ. P. 12(b)(2). A prima facie case is established if plaintiff alleges enough facts to withstand a motion for directed verdict or judgment as a matter of law. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.,* 598 F.3d 802, 810 (11th Cir. 2010). If a defendant challenges jurisdiction by submitting affidavit evidence making a specific factual denial based on personal knowledge, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction. *Mazer,* 556 F.3d at 1274. "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1269 (11th Cir. 2002).

The Robertshaw Defendants requested an evidentiary hearing and Miele did not oppose that request. A court may, in its discretion, hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction. In that case, the court "adjudicate[s] the issue of whether the court has jurisdiction over the defendant's

---

[10] The Robertshaw Defendants did not address the third prong in their written materials or at the evidentiary hearing.

person" by "determin[ing] the credibility of the witness testimony, weigh[ing] the evidence, and find[ing] the relevant jurisdictional facts." *AcryliCon USA, LLC v. Silikal GmbH,* 985 F.3d 1350, 1364 (11th Cir. 2021). No matter how the district court proceeds, the plaintiff must eventually—by the close of evidence—establish personal jurisdiction by a preponderance of the evidence. *Id.*

## IV.  DISCUSSION

Under the minimum contacts analysis first discussed by the Supreme Court in *Int'l Shoe Co.*, courts look at the defendant's activities within the forum. The purpose of the minimum contacts rule is to ensure defendants have "fair warning" that a particular activity may subject it to the jurisdiction of the foreign sovereign. *Burger King Corp.*, 471 U.S. at 471-72. A defendant may not be haled into a jurisdiction solely because of "'random,' 'fortuitous,' or 'attenuated'" contacts. *Burger King,* 471 U.S. at 486; *see World–Wide Volkswagen Corp., v. Woodson,* 444 U.S. 286, 299 (1980).

Miele argues the Robertshaw Defendants are subject to this Court's personal jurisdiction under two theories: (1) RCC is an agent for the Robertshaw Defendants in the United States, including in Florida; and (2) even absent a true agency relationship, the Robertshaw Defendants, directly or indirectly, service and market to customers in Florida as a single brand, Robertshaw, through the Robertshaw

Website.[11]  The Robertshaw Defendants, on the other hand, argue this Court does not have personal jurisdiction over them because they are foreign corporations which do not have a physical presence in Florida and which did not sell the subject solenoid valve, or any valve, to a Florida customer.  Thus, the Robertshaw Defendants deny they have had any contacts with Florida, much less the type of minimum contacts that would satisfy Due Process.

The law for determining the amount of contact with the forum state necessary to constitute "fair warning" is muddled, particularly when it comes to manufacturers of component parts which find their way into a finished product in the forum state and cause injury in that state.  *See Smith v. Poly Expert, Inc.*, 186 F. Supp. 3d 1297, 1300 (N.D. Fla. 2016) (noting the "law of 'minimum contacts' is murky" and "[t]rying to set down the 'elements' of minimum contacts and apply them to a particular factual scenario is difficult").  Despite several Supreme Court cases addressing the issue, no court has come up with a precise formula.  Thus, as Judge

---

[11] In Miele's written submissions, Miele argues the Robertshaw Defendants acted as a "single enterprise" with other Robertshaw entities.  Doc. 126.  When probed on this argument, however, Miele's counsel made clear that it is not pursuing an alter-ego theory, is not seeking to have this Court pierce the corporate veil as to any Robertshaw entity, and acknowledged it had presented little to no evidence any of the Robertshaw entities failed to honor corporate formalities.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 930–31 (2011) (noting that a "single enterprise" theory asks the court to pierce the corporate veil as to as the entities involved in the enterprise).  Moreover, as Miele recognized, a determination that the corporate veil should be pierced as to RCC or Range Parent would result in this case having to be stayed as to those entities because of their pending bankruptcies.

Walker noted in *Smith*, the best approach is to compare the facts of the case before the Court with the facts of other similar cases. *Id.* at 1301.

The starting point for the analysis is *World-Wide Volkswagen Corp.* In *World-Wide Volkswagen Corp*, the Supreme Court held that due process is not violated when a court exercises jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98. Based on the evidence before it, however, the Court determined Oklahoma did not have personal jurisdiction over the nonresident defendants because there was a lack of evidence defendants: (1) do any business in Oklahoma; (2) ship or sell any products to or in that State; (3) have an agent to receive process there; (4) purchase advertisements in any media calculated to reach Oklahoma; or (5) any automobile sold by defendants ever entered Oklahoma with the single exception of the vehicle involved in the case. *Id.* at 288-89. Thus, just because it may have been foreseeable for the product to have made its way to Oklahoma, defendants could not have reasonably anticipated being haled into court in Oklahoma given their lack of activity in Oklahoma. *Id.* at 297.

After *World-Wide Volkswagen Corp.*, the Supreme Court issued two decisions dealing with the stream of commerce analysis, neither of which received majority support. First, in *Asahi*, Justice O'Connor, writing for a plurality, stated that "[t]he

placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi,* 480 U.S. at 112. According to Justice O'Connor, that something "more" may include (1) designing the product for the market in the forum State, (2) advertising in the forum State, (3) establishing channels for providing regular advice to customers in the forum State, or (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. *Id.*

Four justices, including Justice Brennan, however, while concurring in the result, disagreed that it was necessary to require plaintiffs to show additional conduct directed toward the forum before exercising jurisdiction. *Id.* at 117. According to Justice Brennan, "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* Under Justice Brennan's analysis, for personal jurisdiction to comport with Due Process, the flow of defendant's product into the forum state must be "regular and anticipated" and the defendant "must be aware the final product is being marketed in the forum state." *Id.* Thus, for Justice Brennan it was not necessary to add something "more" to the definition of the stream of commerce, because that term encompassed regular activities versus "unpredictable currents or eddies." *Asahi*, 480 U.S. at 117.

Approximately 25 years later, the Supreme Court attempted, unsuccessfully, in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), to clarify the *Asahi* decision. *See Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1381-82 (Fed. Cir. 2015) (noting that after *J. McIntyre*, "[a]gain, the Court did not reach consensus on whether something more than foreseeability is required"). In *J. McIntyre Machinery*, the Court considered whether New Jersey had jurisdiction over a British manufacturer of a metal-shearing machine that caused injury to a plaintiff in New Jersey, "notwithstanding the fact that the company at no time either marketed goods in the State or shipped them there." *Id.* at 878. The plaintiff attempted to establish jurisdiction through the following facts: (1) the defendant's distributor had agreed to market the defendant's machines in the United States, (2) several of the defendant's employees had attended trade shows in the United States, and (3) four of the defendant's machines had ended up in New Jersey. *Id.* at 886.

Although the Supreme Court held that those facts were insufficient to support the state court's exercise of jurisdiction, the justices, once again, could not agree regarding the test to be used. The plurality opinion, authored by Justice Kennedy, concluded that "Justice Brennan's concurrence [in *Asahi*] ... [was] inconsistent with the premises of lawful judicial power" and that "the stream-of-commerce metaphor [could not] supersede either the mandate of the Due Process Clause or the limits on judicial authority that Clause ensures." *Id.* at 883, 886. Justice Breyer and Justice

Alito concurred in the result because there was "no 'regular flow' or 'regular course' of sales in New Jersey" and "no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else" to support the exercise of jurisdiction. *Id.* at 889; *see Fischer v. BMW of N. Am., LLC*, 376 F. Supp. 3d 1178, 1184 (D. Colo. 2019) (discussing opinions).

The Eleventh Circuit has not had occasion to address the stream of commerce analysis since *J. McIntyre*. Thus, it is unclear which test the Circuit would apply. *See Hatton v. Chrysler Canada, Inc.,* 937 F. Supp. 2d 1356, 1365 (M.D. Fla. 2013) (noting that it is not clear whether the Eleventh Circuit would apply a pure stream of commerce or a "stream of commerce plus" analysis); *Vermeulen v. Renault, USA, Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993) (noting that after *Asahi,* the current state of the law regarding personal jurisdiction is unsettled but declining to settle it because jurisdiction over the nonresident defendant was consistent with due process under the more stringent stream of commerce plus analysis). This Court, however, need not resolve that issue because regardless of whether the Court applies Justice Brennan's stream of commerce test or Justice O'Connor's stream of commerce plus test, the facts of this case simply do not cross the jurisdictional threshold under either analysis.

A.    There is a Lack of Evidence Showing RCC was an Agent for the Robertshaw Defendants.

As stated above, Miele contends that RCC was an agent for the Robertshaw Defendants in Florida.  Under Florida law, the elements of an agency relationship are: (1) acknowledgment by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the action of the agent.  *Enic, PLC v. F.F. S. & Co.*, 870 So. 2d 888, 891 (Fla. 5th DCA 2004).  The determination of the existence of an agency is an issue of fact and the burden is on the plaintiff to establish a prima facie case.  *Id.*  The amount of control exercised by the principal must be "high and very significant."  *Id.*

Here, there is a lack of evidence showing the Robertshaw Defendants controlled *any* of RCC's activities.  Miele points to the recharge agreements, but those agreements merely show a sharing of resources between RCC and the Robertshaw Defendants; they do not show the Robertshaw Defendants controlled RCC's activities.  Miele also points out the entities having overlapping directors, namely Aaron Rachelson, and the same CEO, John Hewitt.  Such overlapping management, alone, however does not show the Robertshaw Defendants controlled the day-to-day activities or any activities of RCC.  *See General Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F. Supp. 2d 1335 (S.D. Fla.), *aff'd,* 54 F. App'x 492 (11th Cir. 2002) (finding no personal jurisdiction over a parent with a Florida subsidiary where despite "regular and extensive contact" and a "very close working relationship"

between the parent and the subsidiary, there was no evidence that the parent controlled the subsidiary's daily "basic operation"); *Celgard*, 792 F.3d at 1379 ("Celgard does not point to any evidence on the record establishing that the dealers were operating either as SKI's agents or alter egos. The record does not show any attempt by SKI to purposefully direct or control the activities of the dealers in North Carolina. As such, Celgard has not shown the requisite control for jurisdiction to be premised on the acts of agents.").

Moreover, even if RCC was an agent for the Robertshaw Defendants, jurisdiction would still be lacking because there is no evidence RCC sold any products for the Robertshaw Defendants in United States, much less in Florida.

### B. There is No Evidence the Robertshaw Defendants Indirectly Serviced or Marketed to Florida

Under Miele's second theory for jurisdiction, Miele argues the Robertshaw Defendants indirectly serviced or marketed the United States, including Florida, through a distribution or global network premised on the Robertshaw brand and the use of the Robertshaw Website. Miele relies heavily on the Supreme Court's recent decision in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 355 (2021) to support its argument. Miele's reliance on *Ford*, however, is misplaced.

First, the issue in *Ford* is not the same issue here. Unlike the Robertshaw Defendants, Ford did not contest that it engaged in "substantial business in the [forum] State—among other things, advertising, selling, and servicing the model of

vehicle the suit claims is defective." *Ford Motor Co.*, 592 U.S. at 355. Thus, the question before the Court in *Ford* was not whether Ford had sufficient minimum contacts with the forum State, but whether jurisdiction is proper when the car involved in the crash was not first sold in the forum State, nor was it designed or manufactured there. *Id.* at 355. In answering that question, the Court found jurisdiction was proper because "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States," creating "a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction."[12] *Id.* at 365.

Second, the jurisdictional facts of this case bear no resemblance to those in *Ford.* Miele attempts to establish the Robertshaw Defendants' substantial activities in Florida by analogizing the Robertshaw website and its network of distributors to the network of servicers and dealers in the *Ford* case. Miele argues the Robertshaw

---

[12] As the Court noted, "By every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail—Ford urges Montanans and Minnesotans to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias. Ford cars—again including those two models—are available for sale, whether new or used, throughout the States, at 36 dealerships in Montana and 84 in Minnesota. And apart from sales, Ford works hard to foster ongoing connections to its cars' owners. The company's dealers in Montana and Minnesota (as elsewhere) regularly maintain and repair Ford cars, including those whose warranties have long since expired. And the company distributes replacement parts both to its own dealers and to independent auto shops in the two States. Those activities, too, make Ford money. And by making it easier to own a Ford, they encourage Montanans and Minnesotans to become lifelong Ford drivers." *Ford*, 592 at 365.

Defendants advertised their terms and conditions on the website.  Miele also points out the website describes all the Robertshaw entities as "one global company," advertises products manufactured by the Robertshaw entities, and identifies distributors for Robertshaw located in Florida.

The problem for Miele, however, is that, unlike the facts in *Ford*, there is no evidence the Robertshaw Defendants ever sold a product on the Robertshaw website to anyone in the United States, much less to anyone in Florida; ever sold a product to a Florida consumer through a distributor identified on the website; ever marketed or designed their products for Florida consumers; or ever serviced or repaired a product for a Florida consumer.  To the contrary, Miele's expert, Gordon, testified he was told consumers could not purchase the solenoid valve at issue on the Robertshaw website or even through a distributor identified on the website *and* no valves containing the same ASD number as the subject solenoid valve were advertised for sale on the website.  In other words, unlike the facts in *Ford*, there is no evidence the Robertshaw Defendants have "systematically served" the Florida market, either directly or indirectly.[13]

---

[13] Miele also relies upon the Southern District of Florida's decision in *Patt v. Volkswagen Grp. of Am., Inc.,* 2023 WL 5224294 (S.D. Fla. Aug. 15, 2023), *motion to certify appeal denied*, 2023 WL 7523912 (S.D. Fla. Nov. 14, 2023).  Miele's reliance on *Patt* is also misplaced because the plaintiff there alleged that "Audi does business in Florida by and through subsidiaries including Audi of America, Inc. registered in Broward County," and "introduced uncontroverted evidence of an extensive network of dealerships and service centers in Florida that sell and service Audi vehicles." *Id.* at *6.  As stated above, the only "network" Miele has been able to point to is the Robertshaw

Regardless, "the mere fact that a web site describes 'a network of affiliated companies' and individuals" does not justify asserting personal jurisdiction. *Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 688 (M.D.N.C. 2011) (citation omitted). Indeed, "[c]ourts have consistently rejected the idea that where, as here, a seller of goods uses a website to advertis[e] its wares to the world, the accessing of that website by someone in a state subjects the seller to personal jurisdiction in that state." *Smith*, 186 F. Supp. 3d at 1304 ("Even when an advertisement on a website prompts someone to order a product from a seller and the product then causes harm in the buyer's state, courts are reluctant to find personal jurisdiction based on that sale absent some additional actions directed at the state by the seller."); *see, e.g.*, *Butler v. Beer Across Am.*, 83 F. Supp. 2d 1261, 1267–68 (N.D. Ala. 2000) ("jurisdiction is improper, however, when the nonresident defendant has established a passive Internet site, which acts as little more than an electronic billboard for the posting of information").

Simply put, the Robertshaw Defendants' use of the website, even their potential operation of the site, does not show they purposefully availed themselves of the benefits of doing business in Florida. *See Brown v. Geha-Werke GmbH,* 69 F. Supp. 2d 770, 778 (D. S.C. 1999) (because there was no evidence the defendant

---

Website – through which no Robertshaw SRO products have been advertised or sold and no Robertshaw Italy product has been purchased.

conducted any commercial activity over the internet in the forum state, no evidence any resident of the forum state visited the defendant's website, or evidence that any resident of the forum state purchased defendant's product over the internet or based on the website advertisement, and no evidence defendant had done anything to encourage residents of the forum state to visit the website or that the website was directed at the forum state any more than other places in the world, the court found that the website "cannot provide the basis for an assertion of personal jurisdiction"); *see also Edberg v. Neogen Corp.*, 17 F. Supp. 2d 104, 114 (D. Conn. 1998) (rejecting argument that jurisdiction was established through advertisement of product on website where there was no evidence any user in the forum state had purchased a product from the defendant via the website, no evidence the website was directed at the forum state versus other places, and no evidence products could be purchased through the website).

## V.    CONCLUSION

Miele has not met its burden of establishing this Court's personal jurisdiction over the Robertshaw Defendants.  Like the facts in *World-Wide Volkswagen Corp.,* there is a lack of evidence the Robertshaw Defendants do business in Florida, ship or sell any products to or in Florida, or purchase advertisements in any media calculated to reach Florida.  *See Gifford v. Thinking Outside,* LLC, 506 F. Supp. 2d 1104, 1109 (N.D. Fla. 2007) ("In short, as in *World–Wide Volkswagen,* Plaintiffs

seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single wooden pallet, like the single Audi in *World–Wide Volkswagen,* sold in Kansas to Kansas residents, just happened to find its way to Florida through the unilateral activities of the other named defendants."); *Cincinnati Ins. Co. v. Samsung SDI Co. Ltd.,* 612 F. Supp. 3d 1220, 1231–32 (N.D. Ala. 2020) ("The manufacturing of a single battery pack that arrived indirectly in the State after being incorporated into a new product and changing hands at least three more times cannot suffice to show that Simplo 'purposeful availed' itself of the privileges of conducting activities within the State.").  Also, like the facts in *J. McIntyre,* even if the Robertshaw Defendants marketed products in the United States, only a minimal number of valves (when compared to the total valves sold) ended up in Florida.  *See Tomas v. Bayerische Motoren Werke AG*, 2018 WL 6181172, at *4 (N.D. Ala. Nov. 27, 2018) ("Critically, when a foreign defendant sells 'its products to a distributor in the United States, and no sales were made by the defendant beyond that distributor,' the court cannot exercise personal jurisdiction when only a 'small number of [the products] wound up in the forum state.'").

Also, none of the "plus" factors in *Asahi* exist here.  There is no evidence the Robertshaw Defendants designed valves for the market in Florida, established channels for providing regular advice to customers in Florida, or marketed valves

through a distributor who agreed to serve as their sales agent in Florida.  *See Gould v. Empire Steel Trading Co.*, 765 F. Supp. 980, 984 (E.D. Ark. 1991) (finding no jurisdiction where "[t]here is nothing in the record to indicate that defendant Krakatau designed the product for the market in Arkansas, that defendant advertised in Arkansas, that defendant established channels for providing regular advice to customers in Arkansas, or marketed the product through a distributor who has agreed to serve as the sales agent in Arkansas.  There is nothing in the record to indicate that Krakatau knew or anticipated that the sale of the rods would end up in Arkansas), *aff'd sub nom. Gould v. P.T. Krakatau Steel*, 957 F.2d 573 (8th Cir. 1992). Instead, the Robertshaw Defendants find themselves in this suit based on an isolated occurrence – the traveling of a valve through three different countries, and four different entities, before making its way into a home in Florida, based on the unilateral activity of others, namely Miele.[14]  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (the unilateral activities of others cannot be the basis of jurisdiction).

"The Due Process Clause 'does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the

---

[14] Although Miele sold 1,500 plumbed coffee systems into Florida in the last 18 months, which purportedly contained a "Robertshaw" valve, there is no evidence the Robertshaw Defendants were aware valves sold to Anton Helbling AG would then be sold to Eugster/Frisman AG for use in a plumbed coffee system, which would then be sold to Miele Germany for distribution into the United States (including Florida) by Miele.  Miele did not have a direct relationship with the Robertshaw Defendants and did not require Eugster to use solenoid valves manufactured or distributed by the Robertshaw Defendants.

state has no contacts, ties, or relations.'" *Int'l Shoe,* 326 U.S. at 319.  Exercising

jurisdiction over the Robertshaw Defendants on these facts would be contrary to due

process.  Here, the presence of the valve in Florida was not the result of a "true

stream" i.e., "the regular and anticipated flow" of those valves into Florida and,

instead, was the result of an "eddy."  *See Smith*, 186 F. Supp. 3d at 1305 (granting

motion to dismiss where plaintiffs failed to show that defendant sold its products

with the expectation or knowledge that those products would end up incorporated

into mulch that would be sold in Florida).

Accordingly, it is RECOMMENDED that:

The Robertshaw Defendants' motion to dismiss, Doc. 61, be GRANTED.

At Pensacola, Florida, this 2nd day of April, 2024.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.